# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **TENNESSEE EXTRACTS, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:21-cv-00879** |
| | ) | **Judge Aleta A. Trauger** |
| **TGC SYSTEMS, LLC, d/b/a TOTAL** | ) | |
| **GROW CONTROL, LLC, TOTAL** | ) | |
| **GROW HOLDINGS, LLC, TOTAL** | ) | |
| **GROW CONTROL HOLDINGS, LLC,** | ) | |
| **TG TECH HOLDINGS, LLC, and** | ) | |
| **DEREK OXFORD,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

TGC Systems, LLC d/b/a Total Grow Control, LLC, Total Grow Holdings, LLC ("Total Grow Holdings"), Total Grow Control Holdings, LLC, TG Tech Holdings, LLC (TG Tech) (collectively, "Total Grow Companies"), and Derek Oxford[1] have filed a Motion to Dismiss or Alternatively Motion to Transfer Venue (Doc. No. 10), to which Tennessee Extracts, LLC ("TennEx") has filed a Response (Doc. No. 15). For the reasons set out herein, the motion will be denied.

## I. BACKGROUND[2]

TennEx operates a facility in Smyrna, Tennessee, devoted to the extraction and distillation of cannabidiol ("CBD") oil, which it sells in bulk. (Doc. No. 1-4 ¶ 13.) The Total Grow Companies

---

[1] Oxford's surname erroneously appears in the Notice of Removal (and thus the CM/ECF filing system) as "Ofgord."

[2] Except where otherwise indicated, the facts set forth are taken from the Complaint (Doc. No. 1-4) and are accepted as true for the purposes of Rule 12(b)(6).

are a cluster of related entities, mostly based in Texas,[3] that make and sell equipment related to agricultural production and processing. (*Id.* ¶¶ 2–5.) Oxford, who lives in Florida, is "an owner, officer, and/or director" of each Total Grow Company. (*Id.* ¶ 6.)

In 2019, TennEx entered into a Purchase Agreement with Total Grow Holdings[4] to purchase equipment that TennEx intended to use "to construct and install a multi-part, multi-function extraction and distillation device" that TennEx refers to as "the Plant." (*Id.* ¶ 15.) TennEx alleges that, "[b]ased upon the offer and representations made to [TennEx] by [the Total Grow Companies and their] agents, including, but not limited to, Oxford," TennEx "justifiably believed that purchasing the Plant and working with Total Grow Control would augment Plaintiff's ability to extract and distill high-quality CBD oil in large volumes." (*Id.* ¶ 17.)

The Purchase Agreement includes an introductory section that confirms that the purpose of the agreement was TennEx's purchase of "equipment for extraction of oils from hemp or other materials containing essential oil such as Hemp biomass." (Doc. No. 1-4 at 38) There is also a "Scope of Work Addition" describing that subject matter in more detail. (*Id.* at 51–54.) The Purchase Agreement specifies the anticipated capacity of the completed Plant as (1) processing 4,000 pounds of hemp per day with (2) an 85% recovery rate of CBD oil and (3) 95% ethanol recovery. (*Id.* at 49.) According to the Purchase Agreement's "MECHANICAL GUARANTEE/PLANT ACCEPTANCE" provisions, Total Grow Holdings agreed that the

---

[3] One defendant entity has a principal place of business in Nevada, although the address of its listed registered agent is in Texas. (Doc. No. 1-4 ¶ 2.)

[4] The extent to which the other Total Grow Companies are bound by the contract is contested. In the interest of clarity, the court will describe the contract as between TennEx and Total Grow Holdings, which is specifically identified as the relevant party in the agreement, without prejudice to any determination that additional parties are bound.

2

equipment would "successfully deliver its rated output." (*Id*. at 46.) In exchange, TennEx agreed to pay $2,500,000 under the Purchase Agreement. (*Id.* at 49.)

In light of the complexity of the task at hand, TennEx did not elect to simply buy the raw equipment and handle the construction and installation itself, but rather expected to rely on the Total Grow Companies' "guidance, assistance, training, and purported expertise." (*Id.* ¶ 15.) For example, Total Grow Holdings agreed to provide two months of access to a "Start up Engineer." (*Id.* at 49.) The parties also agreed to the following procedures for completing the installation and transitioning to the functional operation of the Plant, with the assistance and training of Total Grow Holdings:

> Buyer will notify Total Grow Control thirty (30) calendar days before the expected completion of the installation. Total Grow Control with have 15 days to come to the site. Total Grow Control will then conduct classroom training of Buyer's personnel and provide Buyer with a list of tasks that need to be completed for the plant to be deemed mechanically complete. Total Grow Control will then assist Buyer in conducting dynamic test of the equipment and present Buyer with a list of tasks that need to be completed for the plant to be ready to start operations.

(*Id.* at 39.) The Purchase Agreement states that it "shall be governed by and construed in conformity with the laws of the State of Delaware." (*Id.* at 47.)

On May 6, 2020, TennEx entered into another contract, referred to as a "Technology Know-How License Agreement," this time with TG Tech. (*Id.* ¶ 35.) Pursuant to the License Agreement, TG Tech agreed to provide "technical assistance for the start-up, operations, and maintenance" of the system that TennEx had purchased pursuant to the Purchase Agreement. (*Id.* at 56.) To that end, TG Tech agreed to "have available[,] during[] customary business hours, a qualified technician employed or engaged by [TG Tech] to provide immediate and prompt, onsite and/or offsite technical support and repairs (if required) at the [TennEx] Facility (the 'Embedded Technician')." (*Id.*) TG Tech agreed that it would, from time to time, "provide quality control and

3

performance reviews and oversight of [TennEx's] operation of the Unit" and would, as needed, "conduct continuing education and training of [TennEx's] personnel." (*Id.* at 57, 61.) The License Agreement states that it is to be "governed by, and construed in accordance with, the substantive laws of the State of Texas without giving effect to any choice or conflict of law provision." (*Id.* at 65.)

TennEx states that it "completed the construction and installation of the Plant using the equipment it purchased under the Purchase Agreement and installed with Total Grow Control's instruction" in "early 2021." (*Id.* ¶ 41.) TennEx found, however, that the Plant was not "capable of meeting the promised production levels of 4,000 pounds of hemp per day with 85% CBD recovery, 95% ethanol recovery, and CBD oil with less than 0.3% THC content." (*Id.*) On March 8, 2021, TennEx's CEO, Kevin Woods, sent a letter to Oxford and others associated with the Total Grow Companies to "provid[e] the 30-day required notice for commissioning" the Plant, which would, according to the Purchase Agreement, include training and assistance from Total Grow Holdings necessary to get the Plant up to the promised capacity. (*Id.* at 69.)

According to TennEx, "[n]either Total Grow [Holdings] nor TG Tech provided a meaningful response to the March 8, 2021 letter," and, "[t]o date, neither entity has provided [TennEx] with the required information or substantially performed the work requested in the letter." (*Id.* ¶ 45.) The limited support that was provided by the Total Grow Companies was, according to TennEx, deficient in a number of ways,[5] the details of which are of limited importance to the pending motion. It suffices to say that TennEx has alleged that the support provided fell far

---

[5] For example, TennEx alleges that the Total Grow Companies "failed to staff Tennessee-licensed Engineers" when the Purchase Agreement was executed, making them incapable of providing the necessary support in a timely manner when that support was foreseeably due. (*Id.* ¶ 46.) TennEx also alleges that the defendants assigned obligations under the agreements to a third party, in violation of the License Agreement. (*Id.* ¶¶ 39, 59–61.)

4

below what was necessary and required under the Purchase Agreement and License Agreement. (*Id.* ¶¶ 50–52, 54–55, 57.) I

TennEx also takes issue with the equipment itself, which, according to eventual admissions by alleged agents of the Total Grow Companies, "will not be able to function as [the defendants] represented," at least not without substantial additional expenditures. (*Id.* ¶ 56.) For example, components that were supposed to arrive insulated did not, forcing TennEx to handle the design and installation of the insulation itself. (*Id.* ¶ 64.) Some parts were missing essential components, such as sensors and controls . (*Id.* ¶ 65.) Some parts were either "not at all functional" or incapable of being operated consistently with federal safety regulations. (*Id*. ¶¶ 68–69.) As of the commencement of this case, the Plant had never functioned at the production levels specified in the Purchase Agreement. (*Id.* ¶ 41.)

On October 20, 2021, TennEx filed its Complaint in Rutherford County Chancery Court. (*See* Doc. No. 1-2 at 2.) The Complaint states eight counts. Count One is for violation of the Tennessee Consumer Protection Act ("TCPA"), Tenn. Code Ann. § 47-18-101 to -132. (Doc. No. 1-4 ¶¶ 72–88.) Count Two is for professional negligence. (*Id.* ¶¶ 89–95.) Count Three is for negligence *per se*. (*Id.* ¶¶ 96–100.) Count Four is for intentional misrepresentation/common law fraud. (*Id.* ¶¶ 101–15.) Count Five is for negligent misrepresentation. (*Id.* ¶¶ 116–27.) Count Six is for breach of the Purchase Agreement. (*Id.* ¶¶ 128–41.) Count Seven is for breach of the License Agreement. (*Id.* ¶¶ 142–53.) The final count—which the Complaint refers to as "Count Nine," but which is actually Count Eight—is for civil conspiracy. (*Id.* ¶¶ 154–59.) TennEx describes the underlying conspiracy as one to

> (i) mislead [TennEx] into purchasing equipment incapable of performing in the manner that Total Grow Control warranted said equipment could perform; (ii) induce [TennEx] to agree to the terms of both the Purchase Agreement and the License Agreement, despite [the defendants'] inability to perform materially under

either; and (iii) force [TennEx] to continue working with [the defendants] due to the uniqueness of the subject matter of the Project, despite [the defendants'] lack of responsiveness, professional misconduct, negligence, fraud, and breach of contract.

(*Id.* ¶ 155.) The defendants removed the case to this court. (Doc. No. 1.)

On December 20, 2021, the defendants filed their Motion to Dismiss or Alternatively Motion to Transfer Venue (Doc. No. 10). Although the defendants' characterizations of their requests are not entirely clear, they do not appear to seek dismissal of the entirety of the plaintiffs' claims on the merits. In particular, they do not advance any argument regarding the breach of contract claims stated against the actual signatories of the respective contracts, Total Grow Holdings and TG Tech. The defendants also do not raise any arguments for dismissal of the professional negligence and negligence *per se* claims. Rather, the motion focuses primarily on TennEx's alleged failure to distinguish sufficiently between the defendant entities in its pleading.

On the issue of venue, the defendants argue that the case should be transferred to (or dismissed so that it can be refiled in) the Southern District of Texas, where the defendants' personnel can be found and where the system that TennEx purchased was assembled before being shipped to Smyrna, Tennessee. A transfer would allow this case to be considered alongside another case—filed in that district after this one was filed here—involving claims of some of the Total Grow Companies against TennEx and several of its owners and officers. The defendants describe that litigation as involving "unrelated causes of action," but TennEx characterizes the Texas suit as "purely retaliatory" and arising out of the same transactions and occurrences that gave rise to this case. (Doc. No. 11 at 2; Doc. No. 15 at 3 n.1.)

## II. LEGAL STANDARD

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as

true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that the plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

Additionally, Rule 9(b) of the Federal Rules of Civil Procedure states that "a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Generally speaking, a plaintiff seeking to comply with Rule 9(b) must "allege the time, place, and content of the alleged misrepresentation on which he or she relied; the fraudulent scheme; the fraudulent intent of the defendants; and the injury resulting from the fraud." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 504 (6th Cir. 2007) (quoting U.*S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 342 F.3d 634, 643 (6th Cir. 2003)). "Where a complaint alleges 'a complex and far-

reaching fraudulent scheme,' then that scheme must be pleaded with particularity and the complaint must also 'provide examples of specific' fraudulent conduct that are 'representative samples' of the scheme." *U.S. ex rel. Marlar v. BWXT Y–12, LLC*, 525 F.3d 439, 444–45 (6th Cir. 2008) (quoting *Bledsoe.*, 501 F.3d at 510).

This heightened pleading standard is designed to prevent "fishing expeditions," to protect defendants' reputations from allegations of fraud, and to narrow potentially wide-ranging discovery to relevant matters. *Chesbrough v. VPA, P.C.*, 655 F.3d 461, 466 (6th Cir. 2011) (quoting *U.S. ex rel. SNAPP, Inc. v. Ford Motor Company*, 532 F.3d 496, 503 n.11 (6th Cir. 2008)). However, the Sixth Circuit has explained that Rule 9(b) "should not be read to defeat the general policy of simplicity and flexibility in pleadings contemplated by the Federal Rules." *SNAPP*, 532 F.3d at 504. "So long as a [plaintiff] pleads sufficient detail—in terms of time, place, and content, the nature of a defendant's fraudulent scheme, and the injury resulting from the fraud—to allow the defendant to prepare a responsive pleading, the requirements of Rule 9(b) will generally be met." *Id.*

## III. ANALYSIS

### A. Pleading Fraud-Based Claims with Particularity

#### 1. Applicability of Rule 9(b)

Rule 9(b)'s particularity requirement applies not only to claims that explicitly go under the name "fraud" but also to any other "claims sounding in fraud." *Smith v. Bank of Am. Corp.*, 485 F. App'x 749, 751 (6th Cir. 2012). Based on that principle, district courts in Tennessee have held that Rule 9(b) applies to TCPA claims. *See, e.g.*, *Harding v. BMW of N. Am., LLC*, No. 3:20-CV-00061, 2020 WL 5039439, at *2 (M.D. Tenn. Aug. 26, 2020) (Trauger, J.); *Bridgestone Ams., Inc. v. Int'l Business Machines Corp.*, 172 F. Supp. 3d 1007, 1019 (M.D. Tenn. 2016) (Sharp, J.);

*Carbon Processing & Reclamation, LLC v. Valero Mktg. & Supply Co.*, 694 F. Supp. 2d 888, 900, 915 (W.D. Tenn. 2010).[6] Accordingly, Rule 9(b) applies to at least two of TennEx's claims: Count One (under the TCPA) and Count Four (for intentional misrepresentation/fraud).

It is debatable whether Count Five (for negligent misrepresentation) is also subject to Rule 9(b). *See Republic Bank & Tr. Co. v. Bear Stearns & Co.*, 683 F.3d 239, 247–48 (6th Cir. 2012) (noting that courts had disagreed regarding whether Rule 9(b) applies to claims for negligent misrepresentation and concluding that it does apply to such a claim under Kentucky law); *but see PNC Multifamily Cap. Institutional Fund XXVI Ltd. P'ship v. Bluff City Cmty. Dev. Corp.*, 387 S.W.3d 525, 549 (Tenn. Ct. App. 2012) (suggesting that negligent misrepresentation is not subject to Tennessee's equivalent of Rule 9(b)). The "current consensus of federal courts," however, is that Rule 9(b) applies to those claims as well, *Harris v. Nationwide Mut. Fire Ins. Co.*, 367 F. Supp. 3d 768, 777 (M.D. Tenn. 2019) (citation omitted) (collecting cases), and TennEx does not object to following that approach here. (*See* Doc. No. 15 at 11.)

The defendants argue that TennEx has failed to satisfy Rule 9(b) because it has impermissibly relied on group pleading, rather than identifying the culpable actions of each defendant. When pursuing claims against multiple defendants, "a fraud claim requires specific allegations as to each defendant's alleged involvement . . . ." *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 773 (M.D. Tenn. 2013) (Haynes, C.J.). Mere "'group pleading' . . . fails to meet . . . [Rule] 9(b)'s specificity requirements . . . ." *D.E.&J Ltd. P'ship v. Conaway*, 284 F. Supp. 2d 719, 730 (E.D. Mich. 2003), *aff'd*, 133 F. App'x 994 (6th Cir. 2005). The Complaint does, in fact, largely discuss the defendants collectively. The

---

[6] Tennessee courts also subject TCPA claims to Rule 9.02 of the Tennessee Rules of Civil Procedure, which is similar to Rule 9(b) of the Federal Rules of Civil Procedure. *See, e.g.*, *Harvey v. Ford Motor Credit Co.*, 8 S.W.3d 273, 275 (Tenn. Ct. App. 1999).

9

court, accordingly, must determine whether any of the fraud-based claims must be dismissed based on TennEx's failure to identify each defendant's specific culpable actions.

### 2. Intentional and Negligent Misrepresentation Claims (Counts Four and Five)

A plaintiff asserting a cause of action for intentional misrepresentation must establish six elements:

> (1) that [the defendant] made a representation of an existing or past fact; (2) that the representation was false when it was made; (3) that the representation involved a material fact; (4) that [the defendant] made the representation recklessly, with knowledge that it was false, or without belief that the representation was true; (5) that the [plaintiff] reasonably relied on the representation; and (6) that [the plaintiff was] damaged by relying on the representation.

*Davis v. McGuigan*, 325 S.W.3d 149, 154 (Tenn. 2010) (citing *Walker v. Sunrise Pontiac-GMC Truck, Inc.*, 249 S.W.3d 301, 311 (Tenn. 2008)). In order to effectively plead these elements, a plaintiff must identify, at least generally, "who [is alleged to have] made particular misrepresentations and when they were made." *Hoover v. Langston Equip. Assocs.*, 958 F.2d 742, 745 (6th Cir. 1992). A claim for negligent misrepresentation involves similar elements, *see PNC Multifamily*, 387 S.W.3d at 549, such that adequately pleading the more demanding tort of intentional misrepresentation will typically also be sufficient for pleading negligent misrepresentation as well.

As TennEx points out, it does not appear that the defendants dispute that the allegations of the Complaint, if they were all attributable to a single defendant, would be sufficient to comply with Rule 9(b). (*See* Doc. No. 15 at 10.[7]) TennEx has identified a number of allegedly false statements that, it argues, induced it to enter into the agreements with Total Grow Holdings and TG Tech. For example, TennEx has alleged that Total Grow Holdings falsely claimed that the

---

[7] The defendants did not seek leave to file a reply and therefore have not sought to dispute TennEx's characterization of their position.

equipment it was selling could "process 4,000 pounds of hemp per day with an CBD oil extraction rate of 85%" and "recover 95% of ethanol," which, according to the Complaint, was not the case. (Doc. No. 1-4 ¶ 23.) TennEx has also identified, with at least some specificity, when those statements were made. Indeed, some of the statements at issue appear in the prefatory assurances included in the Purchase Agreement and License Agreement themselves. TennEx has identified the other statements as having been made either "at or near the time the parties entered into the Purchase Agreement and the License Agreement" or "throughout the duration of the Project." (Doc. No. 1-4 ¶ 82.) While that level of precision falls short of providing specific dates or times, it is sufficient, in the context of these allegations, to provide the defendants with notice of what is at issue. And TennEx has also explained why the representations were material, how it reasonably relied on them, and how it was harmed. (*Id.* ¶¶ 71, 105.) Together, those allegations describe fraud. The question posed by the defendants' motion, therefore, is merely which, if any, of the defendants has been sufficiently tied to that fraud.

The defendants characterize this argument as supporting dismissal of TennEx's fraud claims in their entirety. TennEx, however, has pleaded specific, individualized allegations with regard to at least some of the defendants. Total Grow Holdings and TG Tech are responsible for the allegedly false representations of competence and capability in and surrounding the Purchase Agreement and License Agreement, respectively, and TennEx has alleged that Oxford personally made similar or identical representations himself. TennEx has therefore adequately pleaded fraud as to those three defendants. The issue of group pleading is therefore primarily relevant to the claims asserted against TGC Systems, LLC and Total Grow Control Holdings, LLC. TennEx has explained that it pleaded claims against those companies, in addition to the others, because the "[d]efendants' own conduct has rendered it impossible for TennEx to determine with which entity

it has been dealing." (Doc. No. 15 at 12.) TennEx argues that that underlying uncertainty was cultivated by the defendants "with the malicious intent to escape liability." (*Id.*)

TennEx correctly points out that "Rule 9(b)'s particularity requirement may be relaxed when certain information is solely within the defendant's knowledge." *Traxler v. PPG Indus., Inc.*, 158 F. Supp. 3d 607, 630 (N.D. Ohio 2016) (quoting *SEC v. Blackwell*, 291 F. Supp. 2d 673, 691 (S.D. Ohio 2003)). The division of responsibilities and actions between affiliated companies is, moreover, precisely the type of information that a plaintiff could not reasonably be expected to know. Nevertheless, there is a difference between relaxing a requirement and suspending it. TennEx has not identified any caselaw suggesting that it can be wholly excused from pleading particularized allegations of fraud against each defendant simply because the defendants' business operations are somewhat opaque.

Ultimately, however, the court is not required to determine whether any allegation specifically attributed to the non-contracting companies is sufficient to satisfy Rule 9(b), because TennEx has adequately pleaded an alternative mechanism for stating fraud claims against them: alter ego liability. "[U]nder Tennessee law, there is a presumption of corporate separateness, and courts do not lightly disregard the corporate form . . . ." *Noranda Aluminum, Inc. v. Golden Aluminum Extrusion, LLC*, No. M2013-02274-COA-R3CV, 2014 WL 4803149, at *3 (Tenn. Ct. App. Sept. 26, 2014) (citation and internal quotation marks omitted). A court may impose liability across corporate lines, however, if it is "convinced that the separate corporate entity 'is a sham or a dummy' or that disregarding the separate corporate entity is 'necessary to accomplish justice.'" *CAO Holdings, Inc. v. Trost*, 333 S.W.3d 73, 88 (Tenn. 2010) (quoting *Oceanics Sch., Inc. v. Barbour*, 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003)). Factors to be considered in determining whether an alter ego relationship exists include:

12

> (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the nonissuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arms length relationships among related entities.

*F & M Mktg. Servs., Inc. v. Christenberry Trucking & Farm, Inc.*, 523 S.W.3d 663, 667 (Tenn. Ct. App. 2017) (citation omitted). If a colorable basis exists for disregarding the corporate form, then "the question of whether [a] corporate entity is 'a mere instrumentality of an individual or parent corporation' is a question of fact for the finder of fact." *Dog House Invs., LLC v. Teal Properties, Inc.*, 448 S.W.3d 905, 918 (Tenn. Ct. App. 2014) (quoting *Elec. Power Bd. of Chattanooga v. St. Joseph Valley Structural Steel Corp.*, 691 S.W.2d 522, 526 (Tenn. 1985)); *see also Wells ex rel. Baker v. State*, 435 S.W.3d 734, 756 (Tenn. Ct. App. 2013) ("The existence of an alter-ego relationship is a question of fact.") (citing *Bracken v. Earl*, 40 S.W.3d 499, 502 (Tenn. Ct. App. 2000)).

The Complaint explicitly asserts that the Total Grow Companies "are alter egos of one another," each of which "is owned and/or managed by Oxford." (Doc. No. 1-4 ¶¶ 4 n.1, 14.) TGC Systems, LLC, Total Grow Control Holdings, and TG Tech all share the same address, and that address is also listed for Oxford as the registered agent of TGC Systems, LLC. (*Id.* ¶¶ 2–5.) All of the defendants are represented by the same attorneys in this case. As TennEx points out, moreover, portions of the relevant documents themselves appear to discuss the Total Grow Companies' operations as effectively unitary. For example, in the License Agreement, TG Tech states that it "represents a technologically advanced process and know-how which is provided as a complete

package of equipment ('Unit') and services designed for the extraction of essential oils from 4000 PPD (pounds per day) of raw hemp biomass." (*Id.* at 56.) That "complete package of equipment . . . and services" which TG Tech "represent[ed]" included the equipment purchased, not from TG Tech, but from Total Grow Holdings. The letterhead of the Scope of Work Addition to the Purchase Agreement refers to "Total Grow Control" as "THE AUTONOMOUS HORTICULTURE CO." and uses yet another entity name—Total Grow Solutions, LLC—in its footer, accompanied by a single address, single website URL, and single phone number. (*Id.* at 51.) Finally, when the defendants assigned their project responsibilities to a third party, they appear to have done so collectively and unitarily. (*Id.* ¶¶ 59–61.)

None of that, of course, necessarily means that the Total Grow Companies were actually alter egos. However, "Rule 9(b) is not designed to force a plaintiff to prove their case in the complaint . . . ." *United States v. Assocs. in Eye Care, P.S.C.*, No. Civ. 13-27-GFVT, 2014 WL 414231, at *7 (E.D. Ky. Feb. 4, 2014) (citing *New England Health Care Emps. Pension Fund v. Fruit of the Loom, Inc.*, No. CIV.A. 1:98-CV-99-M, 1999 WL 33295037, at *6 (W.D. Ky. Aug. 16, 1999)). At this stage, TennEx was only required to plead facts sufficient to give rise to a plausible right to recover on its claims, and it has done so by pleading a plausible account that Oxford and the Total Grow Companies were alter egos of the same unitary fraudulent operation, such that a claim for fraud stated against one of them should be recoverable from the others. The court accordingly will not dismiss Count Four or Count Five against any defendant.

### 3. TCPA Claim (Count One)

The TCPA provides a private right of action to "[a]ny person who suffers an ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated, as a result of the use or employment by another person of an unfair or

14

deceptive act or practice described in [Tenn. Code Ann.] § 47-18-104(b) and declared to be unlawful by" the Act. Tenn. Code Ann. § 47-18-109(a)(1). "Person" is defined to include both natural persons and business entities. Tenn. Code Ann. § 47-18-103(14). The list of "unfair or deceptive acts or practices" prohibited by § 47-18-104(b) is lengthy and includes both broadly-worded general prohibitions and narrower, industry-specific prohibitions. Tenn. Code Ann. § 47-18-104(b)(1)–(52). The TCPA "is to be liberally construed to protect consumers and others from those who engage in deceptive acts or practices." *Morris v. Mack's Used Cars*, 824 S.W.2d 538, 540 (Tenn. 1992); *see also* Tenn. Code Ann. § 47-18-102.

The Complaint identifies at least five practices prohibited under the TCPA that, TennEx alleges, the Total Grow Companies committed during their dealings with TennEx: "[r]epresenting that goods or services have . . . characteristics, . . . uses, benefits or quantities that they do not have," Tenn. Code Ann. § 47-18-104(5); "[r]epresenting that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another," Tenn. Code Ann. § 47-18-104(7); "[a]dvertising goods or services with intent not to sell them as advertised," Tenn. Code Ann. § 47-18-104(9); "[r]epresenting that a service, replacement or repair is needed when it is not," Tenn. Code Ann. § 47-18-104(13); and "[r]epresenting that a person is a licensed contractor when such person has not been licensed as required," Tenn. Code Ann. § 47-18-104(35). (Doc. No. 1-4 ¶ 85.) The defendants' briefing on the TCPA does not contest the applicability of those individual provisions to the scheme described in the Complaint. Rather, the defendants echo their arguments regarding the misrepresentation counts: that TennEx has failed to tie the relevant prohibited practices to specific defendants.

The defendants' argument fails with regard to this count for the same reason it failed with the others. Even if there are some defendants that have not been specifically pleaded to have

15

committed bad acts uniquely attributable to them, TennEx has pleaded alter ego liability with sufficient particularity to proceed to discovery on the matter. At least as represented in the Complaint, the Total Grow Companies functioned as a unitary business directed, at least in significant part, by a single individual, Oxford. While discovery may ultimately reveal that TennEx cannot overcome the presumptive validity of the companies' separate corporate forms, the court will not prematurely close off that possibility outright. The court, accordingly, will not dismiss Count One.

### 4. Conspiracy to Commit Fraud

"[P]leading requirements governing civil conspiracies are relatively strict." *Fieger v. Cox*, 524 F.3d 770, 776 (6th Cir. 2008) (citing *Fisher v. City of Detroit*, 4 F.3d 993 (6th Cir. 1993)). "To prevail on [a] civil conspiracy claim," a plaintiff must establish "'(1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury.'" *Garner v. Coffee Cnty. Bank*, No. M2014-01956-COA-R3-CV, 2015 WL 6445601, at *9 (Tenn. Ct. App. Oct. 23, 2015) (quoting *Kincaid v. SouthTrust Bank*, 221 S.W.3d 32, 38 (Tenn. Ct. App. 2006)). The defendants argue that TennEx cannot satisfy the second of those requirements because it has not sufficiently pleaded a predicate tort. As the court has already held, however, TennEx has adequately pleaded fraud. That aspect of the defendants' argument is therefore unavailing.

The defendants argue next that TennEx has failed to "plead any specific and material facts as to when, where, or how the five Defendants supposedly came together to become 'alter egos of one another' to injure Plaintiff." (Doc. No. 11 at 13.) The defendants, however, are conflating

alternative theories of liability.[8] If the defendants are, in fact, all simply alter egos of the same operation, then conspiracy would not provide the appropriate lens for viewing their relationship; after all, if the defendants "are not separate entities" then they "cannot be the sole parties to a conspiracy." *Trau-Med of Am., Inc. v. Allstate Ins. Co.*, 71 S.W.3d 691, 704 (Tenn. 2002). It is possible, however, that the defendants are not alter egos and are, in fact, distinct entities, as the defendants claim they are. If that is the case, then their acting in concert—as described in the Complaint and confirmed by, among other things, the overlapping nature of the subject matter of the Purchase Agreement and License Agreement—could plausibly be a conspiracy to further a fraudulent scheme.

While some degree of specificity is required in the pleading of a conspiracy, the Federal Rules are not blind to the fact that illegal conspiracies are, generally speaking, typically entered into behind closed doors. TennEx has pleaded what the conspiracy was and how individual defendant entities were involved; there is no requirement that it plead some specific meeting where the conspiracy was hatched. That is particularly true given that each of the potential conspirators shared leadership.[9] While TennEx may eventually need to determine whether this case involved either a cluster of fraudulent alter egos or a conspiracy of genuinely distinct companies, it has sufficiently pleaded both alternative theories in its Complaint. The court, accordingly, will not dismiss the conspiracy claims.

---

[8] To be fair, TennEx bears some of the responsibility for this conflation, having included an out-of-place discussion of alter ego liability in its statement of Count Eight. (Doc. No. 1-4 ¶ 158.) Conspiracy and alter ego liability, however, are established legal concepts, and the boundaries between them are not affected by a party's pleading.

[9] A separate issue may exist regarding whether Oxford himself may be properly characterized as a conspirator, given that he allegedly held formal roles in each of the Total Grow Companies. *See Trau-Med*, 71 S.W.3d at 704 (discussing immunity for intracorporate conspiracy). Because the defendants have not briefed that issue, however, the court will not address it at this juncture.

## B. Breach of Contract

"In a breach of contract action, claimants must prove the existence of a valid and enforceable contract, a deficiency in the performance amounting to a breach, and damages caused by the breach." *Fed. Ins. Co. v. Winters*, 354 S.W.3d 287, 291 (Tenn. 2011) (citing *ARC LifeMed, Inc. v. AMC-Tennessee, Inc.*, 183 S.W.3d 1, 26 (Tenn. Ct. App. 2005)). The Complaint, on its face, clearly pleads those elements with regard to at least two defendants, Total Grow Holdings (which was bound by the Purchase Agreement) and TG Tech (which was bound by the License Agreement). The defendants argue, however, that the court should dismiss the breach of contract claims against the other parties, because they were not bound by any identified binding contract.

As with the fraud claims, the court cannot dismiss the breach of contract claims against any defendant at this stage, because TennEx has sufficiently pleaded that the various defendants are alter egos of the same fraudulent operation. The court stresses again that this motion presents just the first—and least demanding—hurdle that TennEx will face in pursuing this theory of liability, and it is currently unproven that the defendants are anything other than ordinary affiliated companies with distinct functions, assets, and liabilities. Rule 12(b)(6), however, requires the court to accept a plaintiff's allegations as true. The court, accordingly, will not dismiss the breach of contract claim against any individual defendant.

## C. Motion to Transfer

Under 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." In deciding a motion to transfer, a district court should consider "case-specific factors," such as "the private interests of the parties, including their convenience and the convenience of potential

witnesses, as well as other public-interest concerns, such as systemic integrity and fairness, which come under the rubric of interests of justice." *Moses v. Bus. Card Express, Inc.*, 929 F.2d 1131, 1136–37 (6th Cir. 1991) (internal citations omitted); *see also Reese v. CNH Am. LLC*, 574 F.3d 315, 320 (6th Cir. 2009). The moving party bears the burden of establishing that transfer is warranted. *See, e.g.*, *Picker Int'l, Inc. v. Travelers Indem. Co.*, 35 F. Supp. 2d 570, 573 (N.D. Ohio 1998); *Blane v. Am. Investors Corp.*, 934 F. Supp. 903, 907 (M.D. Tenn. 1996); *Clayton v. Heartland Res., Inc.*, 2008 WL 2697430, at *3 (M.D. Tenn. June 30, 2008). Ultimately, a district court has "broad discretion to grant or deny a motion to transfer a case." *Phelps v. McClellan*, 30 F.3d 658, 663 (6th Cir.1994) (internal citations omitted).

"[U]nless the balance [of the factors] is strongly in favor of the defendants, the plaintiff's choice of forum should rarely be disturbed." *Reese*, 574 F.3d at 320 (quoting *Dowling v. Richardson–Merrell, Inc.*, 727 F.2d 608 (6th Cir. 1984)). This case is about a Tennessee-based company's purchase of equipment to be installed at a Tennessee facility. That equipment, the quality of which is at issue in this case, is in Tennessee now. TennEx, acting pursuant to the ordinary discretion that our system affords plaintiffs, chose to bring its claims in Tennessee, which undoubtedly has a significant local interest in the quality of equipment sold to the companies within its borders. While the court does not doubt that it would be more convenient for the defendants to litigate the case in Texas, "[t]ransfer of venue is inappropriate where it would serve only to transfer the inconvenience from one party to the other." *OnSomble, Inc. v. O'Rourke*, No. 3-16-493, 2016 WL 11653614, at *1 (M.D. Tenn. June 2, 2016) (Campbell, J.) (citing *Diebold, Inc. v. Firstcard Fin. Servs., Inc.*, 104 F.Supp.2d 758, 764 (N.D. Ohio 2000)).

The specific hardships that the defendants have identified are, moreover, unpersuasive and minimally documented. The defendants generally claim that evidence and witnesses, particularly

its own employees, are located in Texas. The defendants, however, provide no details or supporting information sufficient to allow the court to evaluate the extent and nature of the supposed hardship. In any event, the convenience of employee witnesses is entitled to less weight than the convenience of non-party witnesses, *Steelcase, Inc. v. Smart Techs., Inc.*, 336 F. Supp. 2d 714, 721 (W.D. Mich. 2004), and TennEx has stated that it is likely to rely on some Tennessee-based non-party witnesses who worked as subcontractors. As for documentary evidence that may be in Texas, technological advancements—specifically the ability to "to transfer records electronically"—have reduced the importance of the accessibility of such evidence to the venue inquiry, to the point where, in many cases, that "factor matters little." *Staggert v. Team Oil Tools LP*, No. 2:16-CV-822, 2017 WL 2189558, at *5 (S.D. Ohio May 18, 2017) (citing *Paine v. Intrepid U.S.A., Inc.*, No. 3:14-2005, 2015 WL 3743357, at *8 (M.D. Tenn. June 15, 2015)). One thing that cannot be transferred electronically, of course, is the Plant itself—which is in Tennessee.

The hardships that the defendants have identified are still real, even if the defendants have not significantly documented them. Such challenges, however, are an unavoidable feature of doing business across state lines. Someone is going to have to litigate this case out-of-state, regardless of what the court does; there is no escaping the interstate nature of the case by moving from one state to the other. The structure of our system is that, in such an instance, the plaintiff typically chooses the forum, and, if that forum is one that does, in fact, have jurisdiction, the plaintiff's choice is only disturbed if there is a significant reason for doing so. No such reason exists here. The court accordingly concludes that no transfer is warranted in this case, which will continue in this district.

## IV. CONCLUSION

For the foregoing reasons, the defendants' Motion to Dismiss or Alternatively Motion to Transfer Venue (Doc. No. 10) will be denied.

An appropriate Order will enter.

_____
ALETA A. TRAUGER
United States District Judge